IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JODI L. SUSON,<br><br>        Plaintiff,<br><br>    v.<br><br>PNC BANK, NATIONAL ASSOCIATION,<br><br>        Defendant. | No. 16 cv 5450<br><br>Judge Matthew Kennelly<br>Magistrate Judge Mary Rowland |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT**

Plaintiff Jodi Suson ("Suson") brings claims against PNC Bank, National Association ("PNC"), her former employer, under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA), the Illinois Wage Payment and Collection Act, 820 ILCS 115/1, *et seq.* ("IWPCA"), and the Illinois Minimum Wage Law, 820 ILCS 105/1, *et seq.* ("IMWL"), alleging that PNC unlawfully failed to pay her commissions she earned and wages for overtime work performed. PNC now moves for summary judgment on Suson's claims.

Suson's claim under the IWPCA that PNC failed to pay her commissions is premised on an alleged verbal agreement at her initial job interview she would be paid for all sales. Suson's IWPCA claim fails as a matter of law because she cannot establish that there was a contract or agreement, or a "manifestation of mutual assent" by both parties. Suson's understanding is based on her subjective beliefs, her experiences with a prior employer, and what she believed to be the "industry norm," but it runs contrary to PNC's written Incentive Plans. Even if she can establish such an agreement, her IWPCA claim fails as a matter of law because Suson was an at-will employee who continued to work and accept commission payments under the terms of PNC's Incentive Plans.

-1-

Suson's overtime claims under the FLSA and IMWA are subject to dismissal in their entirety because Suson failed to comply with PNC's reasonable process for reporting overtime, and her claim that PNC should have been aware that she worked overtime based on emails sent from her home lacks merit. In the alternative, Suson's overtime claims should be limited to the five weeks specifically alleged in her Complaint and limited under the applicable statutes of limitations. Additionally, her claim for liquidated damages under the FLSA fails as a matter of law because the evidence shows PNC acted in good faith with respect to overtime payments.

## I.    SUMMARY OF UNDISPUTED FACTS

### A.    Suson's Employment With PNC.

PNC is a federally chartered National Banking Association that provides banking products and services. SOF ¶ 5. Suson submitted an employment application to PNC for a Financial Specialist ("FS") position in which she acknowledged that, if employed, her employment would be at-will. SOF ¶¶ 4, 6-7. The role of an FS at PNC was not to sell investment products to customers; rather, the FS, who worked in PNC's retail branch offices, referred customers to others for potential investment sales. SOF ¶ 8. The FS was also responsible for selling traditional banking products. SOF ¶ 9.

Suson claims that during her job interview she was told that, in addition to her base salary, she would be eligible to earn commissions for all sales. SOF ¶ 10. Based on her prior experience at Chase Bank, and what she believed to be the "industry norm," Suson understood that she would receive commissions for all customers that she referred, as long as an investment sale was made. SOF ¶ 11. On July 17, 2012, after Suson accepted PNC's job offer, PNC sent Suson a letter confirming her start date, her base salary, and her eligibility to participate in PNC's Retail Branch Bank Incentive Plan. SOF ¶ 12.

      **B.    PNC's 2012 and 2013 FS Incentive Plans Required Financial Specialists To Hold The Appropriate License To Sell The Investment Product To Receive Incentive Payments.**

PNC's FS Incentive Plans are in writing, available to employees via PNC's intranet, and distributed to employees. SOF ¶ 15. Suson did not review the 2012 FS Incentive Plan until the beginning of 2013, and she did not review the 2013 FS Incentive Plan in full detail until the second quarter of 2013. SOF ¶ 16. Under the terms of both PNC's 2012 and 2013 FS Incentive Plans, upon meeting a minimum quarterly threshold, in addition to their base salary, FSs were eligible to earn quarterly incentive based on their selling or referring investment products and bank products. SOF ¶ 17. The FS must hold the license to sell the investment product to receive any incentive credit for referrals under both these Incentive Plans. SOF ¶ 19. Further, both the 2012 and 2013 FS Incentive Plans treated referrals to PNC's Wealth Management business as bank products, and, in order to be eligible to receive any incentive, the FS must be in an "Active" statue when the award is paid, which includes being on a job-protected family medical leave. SOF ¶ 22.

      **C.    Suson's Claims For Unpaid Commissions Under The IWPCA.**

Suson claims that PNC owes her a total of $31,569 in commissions for investment referrals that resulted in sales between the second quarter of 2013 and the first quarter of 2014. SOF ¶ 28. Suson alleges that PNC's failure to pay her incentive for these referrals was contrary to the verbal "agreement" during her initial job interview that she would be paid for all sales. SOF ¶ 27.

It is undisputed that during her employment with PNC Suson held only the Series 6 and 63 licenses with FINRA. SOF ¶ 23. Under the 2013 FS Incentive Plan, because Suson did not hold the appropriate license to sell managed money accounts (Series 7 or 65), she was not entitled to any incentive payments for customers she referred who purchased those products. SOF ¶¶ 24, 29-32. Beginning with her offer letter, PNC communicated and made available to Suson everyday of her active employment the applicable FS Incentive Plan. SOF ¶¶ 12, 15.

Further, PNC paid Suson the proper incentive payments for her investment and bank referrals under the 2013 and 2014 FS Incentive Plans. SOF ¶¶ 33-36, 38-42.

### D. PNC's Policies Regarding Overtime.

PNC's written overtime policies provide that all non-exempt employees are paid overtime (time and a half) in accordance with federal and state regulations, and all time off hours are excluded from hours worked for the purposes of overtime calculation, and only hours actually worked will be used to determine if the 40-hour threshold has been met during each workweek. SOF ¶¶ 43-47. Under PNC's overtime policies, employees are responsible to obtain their supervisor's approval prior to working overtime and to accurately fill out their time cards; falsification of a time sheet is considered a dishonest act that will lead to termination. SOF ¶¶ 45-46.

As an FS, Suson was a non-exempt employee, eligible to earn overtime pay. SOF ¶ 49. Suson was required to complete an accurate timesheet at the end of each week and the time-cards were reviewed by her supervisor. SOF ¶ 50. Suson reported her hours from the start of her workday at the branch until the end of her workday at the branch, clocking out for lunch. SOF ¶ 51. PNC paid Suson all of the overtime she reported on her time-cards. SOF ¶ 52.

### E. Suson's Overtime Claims.

In November 2012, Suson transferred from the Park Ridge Branch to the Libertyville Branch. SOF ¶ 53. Suson did not report to the Branch Managers at either location; rather, she reported to a Financial Specialist Team Manager, who did not work in the retail branch office. SOF ¶ 55.

Suson alleged at her deposition that she worked, conservatively, fifteen (15) hours a week from home for every single week of her employment with PNC, for a total of 99 weeks, or 1485 hours. SOF ¶ 57.[1] Suson is not claiming overtime for two periods that she was on approved

---

[1] Suson alleged in her Complaint, under the heading "SPECIFIC WEEK BY WEEK OVERTIME OWED," that she worked approximately 15 hours of overtime from home, beyond a full work week of 40 hours, for only five separate weeks (the first three weeks of June 2013, and the second and third weeks of March 2014). SOF ¶ 56. As discussed in detail in Section IV.B., the Court should limit Suson's overtime claims to those weeks.

medical leave: December 15, 2013 through January 17, 2014, and May 1, 2014 through June 22, 2014.  SOF ¶ 58.  During some weeks, Suson would take a vacation day or a personal day, which, under PNC's policy would not count towards the 40-hour work week.  SOF ¶¶ 59-60.

Suson alleges that, while working at home, she completed work tasks such as prospect lists, business plans, quick starts, and action items, and that she also studied for her Series 65 examination (between late April 2013 and August 2013), and drafted complaints to human resources about John Acklam ("Acklam"), the Branch Manager of the Libertyville Branch.  SOF ¶¶ 54, 60, 66.  Suson claims that she was unable to use the three computer terminals in the Libertyville Branch that had the software that she felt was necessary to complete her work, and that she was "forced" to work from home because of this lack of access.  SOF ¶¶ 61-62.  Suson did not ask her supervisors for prior approval to work from home or to work overtime, as required by PNC's overtime policy.  SOF ¶¶ 62, 77.  Rather, she claims that Acklam would not let her use his computer, and when her managers did not provide a solution, she was "forced" to complete the work from home.  SOF ¶ 63.

PNC's written policy required FSs to study for their financial license exams during the 40-hour work week.  SOF ¶ 64.  Suson alleges that, even though she was allotted the two hours a day to study at the Libertyville Branch, the branch was short staffed and Acklam consistently pulled her away from studying to meet with customers, which forced her to study from home.  SOF ¶ 65.  On June 6, 2013, Suson requested that she be allowed to study for the Series 65 outside of the branch, and PNC denied the request.  SOF ¶ 66.  Suson defied PNC's denial of her request, and she estimates that, beginning in April 2013, she studied for the Series 65 between 50 to 60 hours at home for the exam in August 2013, which she failed.  SOF ¶ 67.

Suson's supervisors never told her not to report hours on her time-cards, but she did not include on her time-cards the hours she worked from home because she believed that the hours would not be approved.  SOF ¶¶ 68-69.  According to Suson, if she inputted over 40 hours on her time-cards, Branch Manager Acklam would become angry, and would respond with a standard

answer that she needed to come in late, or take a longer lunch, to control the amount of overtime in the branch.  SOF ¶ 70.  However, Suson alleges that her managers were fully aware that she performing working from because she would send emails to her managers, with attached documents, from her home "gmail" account after normal branch hours.  SOF ¶¶ 71, 74-75.  Suson did not indicate in any of the emails how long she spent working on any task.  SOF ¶ 72.[2]  FS Team Manager Matthew Rick ("Rick") acknowledged receiving several emails from Suson from her home "gmail" account after hours, including one enclosing a "Business Plan."  SOF ¶ 77.  Upon receiving such emails from Suson, Rick and other managers would instruct her she needed to record the time on her time-cards (which she never did), that she should not be sending emails from her personal computer after normal business hours and that she needed to get approval from her supervisors ahead of time to work from home.  SOF ¶¶ 67, 75.  Suson, in her lengthy written complaints to human resources, never asserted that she was not being paid overtime for work done at home.  SOF ¶ 78.

## II.  LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The Court may not weigh conflicting evidence or make credibility determinations.  *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011).  The nonmoving party cannot rest on her pleadings, but must produce her own admissible evidence.  *McGinn v. Burlington N. R.R. Co.*, 102 F.3d 295, 298 (7th Cir. 1996) (citations omitted).

---

[2] In 2014, after Suson filed a wage claim with the Illinois Department of Labor (Wage Claim No. 14-003-33), Suson deleted from her home computer emails she sent using her "gmail" account to her managers from home after normal business hours.  SOF ¶ 73.

### III. PNC IS ENTITLED TO SUMMARY JUDGMENT ON SUSON'S IWPCA CLAIM

#### A. The IWPCA Requires A Contract Or An Agreement Between The Parties For Payment Of The Compensation Being Sought.

Under the IWPCA, "[e]very employer shall be required, at least semi-monthly, to pay every employee all wages earned during the semi-monthly pay period." 820 Ill. Comp. Stat. 115/3. "Wages" are statutorily defined as "any compensation owed an employee by an employer ***pursuant to an employment contract or agreement between the 2 parties***, whether the amount is determined on a time, task, piece, or any other basis of calculation." 820 ILCS 115/2 (emphasis added). To prevail on an IWPCA claim, the plaintiff must first establish that there was a valid employment contract or agreement to pay the compensation at issue. *Hess v. Kanoski & Associates*, 668 F.3d 446, 452 (7th Cir. 2012). Illinois courts have interpreted the term "agreement" to be broader than a contract and require evidence of a "manifestation of mutual assent." *Id.* at 452 (citing *Zabinsky v. Gelber Grp., Inc.*, 807 N.E.2d 666, 671 (Ill. App. Ct. 1st Dist. 2004)).

#### B. Suson's IWPCA Claim Fails Because She Cannot Establish That There Was A Manifestation Of Mutual Assent To A Contract Or An Agreement.

Suson's claim under the IWPCA that PNC failed to pay her commissions is premised on the alleged verbal, and vague, "agreement" at her initial job interview that she would be paid for all sales. Suson testified that her understanding of what PNC employees told her at the interview was based on her prior work experience at Chase Bank, and what she believed to be the "industry norm." SOF ¶ 11. Specifically, Suson understood that she would be paid on commissions for all customers she referred if an investment sale was made. However, Suson's subjective understanding at the interview of what she would be paid, based on her prior work experience and her understanding of industry norms, does not salvage her IWPCA claim because it lacks a "manifestation of mutual assent" from *both* parties. *See Schneider v. Ecolab, Inc.*, 2015 U.S. Dist. LEXIS 37440, at *14-15 (N.D. Illinois March 25, 2015); *Zabinsky*, 807 N.E.2d at 671.

What Suson claims to have understood is only half the question and she cannot proffer any evidence on which a reasonable jury could find that PNC offered or mutually assented to pay her beyond the terms of the FS Incentive Plan that was referenced in the July 17, 2012, letter confirming the terms of her employment, and which was available to her throughout her employment. *See Schneider*, 2015 U.S. Dist. LEXIS 37440, at *14-15 (granting partial summary judgment on IWPCA claim where plaintiff could not establish mutual assent based on what he was allegedly told during a job interview); *Gallardo v. Scott Byron & Co.*, 2014 U.S. Dist. LEXIS 4634, *49-54 (N.D. Ill. Jan. 14, 2014) (granting summary judgment on IWPCA claim where plaintiff could not substantiate an "implicit agreement" established a "manifestation of mutual assent"). Accordingly, because Suson cannot establish that PNC mutually assented to pay Suson commissions on all sales, her claims under the IWPCA are subject to dismissal.

      C.      **Suson's IWPCA Claims Also Fail As A Matter Of Law Because, As An At-Will Employee, She Continued To Work And Accept Commission Payments Under The Terms Of PNC's FS Incentive Plans.**

In the alternative, even if Suson could establish that there was a "manifestation of mutual assent" at her job interview to pay her commissions for *all* sales, her IWPCA claims still fail as a matter of law because she was an at-will employee who continued to work and accept commission payments under the terms of PNC's FS Incentive Plans at the start of her employment, and following the implementation of new plans in 2013 and 2014. *See Geary v. Telular Corp.*, 793 N.E.2d 128, 131 (Ill. App. Ct. 1st Dist. 2003) ("When an at-will employee continues to work after a change in commission plan, he is deemed to have accepted the change"); *Schoppert v. CCTC International, Inc.*, 972 F. Supp. 444, 447 (N.D. Ill. 1997) (continuing to work while receiving commissions under the new structure must be seen in legal terms as an acceptance).

Here, in the July 17, 2012, letter to Suson confirming the terms of employment, PNC referenced the PNC FS Incentive Plan, and all the FS Incentive Plans (2012-2014) were available to employees via PNC's intranet and distributed to employees. PNC's 2012 and 2013 FS

Incentive Plans unmistakably provided that an employee must hold the license to sell the investment product to receive any incentive credit, and Suson had neither the Series 7 nor Series 65 licenses that permitted her to sell managed money accounts. Further, PNC paid Suson the correct amount of incentive under the terms of the 2013 and 2014 FS Incentive Plans, and her claims of lack of knowledge or misunderstanding of PNC's FS Incentive Plans, or her personal philosophical differences with them, are irrelevant.

## IV. SUMMARY JUDGMENT DISMISSAL IS WARRANTED ON SUSON'S OVERTIME CLAIMS.

### A. Suson's Overtime Claims Are Subject To Summary Judgment Because She Failed To Comply With PNC's Reasonable Process For Reporting Overtime.

To succeed on her FLSA and IMWL claims, Suson must prove, by a preponderance of the evidence that she performed overtime work for which she was not properly compensated. *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 173 (7th Cir. 2011). The IMWL parallels the FLSA, and so the same analysis applies to both claims. *Villareal v. El Chile, Inc.*, 776 F. Supp. 2d 778, 784 (N.D. Ill. 2011). In addition, Suson must show that PNC had actual or constructive knowledge that she worked overtime without compensation because "the FLSA stops short of requiring the employer to pay for work it did not know about, and had no reason to know about." *Kellar*, 664 F.3d at 177 (citing 29 U.S.C. § 203(g) ("'Employ' includes to suffer or permit to work.")); 29 C.F.R. § 785.11 ("The employer knows or has reason to believe that he is continuing to work")). As the Seventh Circuit explained, "While an employer cannot slyly sit back in order to reap extra work without pay, it has no obligation to pay for work it did not know about and had no reason to know about." *Gaines v. K-Five Constr. Corp.*, 742 F.3d 256, 270 (7th Cir. 2014). Put another way, the FLSA does not impose liability on an employer for unpaid overtime if an employer did not have the opportunity through reasonable diligence to learn overtime was being used. *Kellar*, 664 F.3d at 177; *see* 29 U.S.C. § 203(g); 29 C.F.R. § 785.11. An employee does not win the day by having her employer concede it was "theoretically possible" that she was performing unpaid overtime work. *Roberts v. Advocate Health Care*, 119

F. Supp. 3d 852, 861 (N.D. Ill. 2015) (holding that it was speculative to assume that a supervisor is able to detect that a plaintiff's time cards were short certain overtime hours).

The Sixth Circuit has also held that under the FLSA, "if an employer establishes a reasonable process for an employee to report uncompensated work time, the employer is not liable for non-payment if the employee fails to follow this process" as it thwarts the employer's ability to comply with the FLSA. *White v. Baptist Mem. Health Care Corp.*, 699 F.3d 869, 873 (6th Cir. 2012). Other Courts of Appeal have held that employees who intentionally ignored their employer's policy and procedure, and "neither sought authorization to work such overtime nor reported those the alleged hours" have no FLSA overtime claim. *See Fairchild v. All American Check Cashing, Inc.*, 815 F.3d 959, 965 (5th Cir. 2016); *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981). While the Seventh Circuit has not directly held that the failure to follow clear overtime procedures extinguishes an FLSA claim, it has held that such a failure could preclude an employer from learning of the employee's overtime work. *Gaines*, 742 F.3d at 270; *see also Zhou v. IBM*, 2017 U.S. Dist. LEXIS 48547, at *55-63 (N.D. Iowa Mar. 31, 2017) (rejecting the argument that the defendant "must be expected to intuit, from [plaintiff's] online activity, that he worked hours above and beyond what he reported"). In *Zhou*, the Court concluded, applying the Sixth Circuit's reasoning in *White,* "To require [an employer] to painstakingly wade through emails between itself and [plaintiff], which do no more than raise the possibility that he was being overworked, or to compare email and instant message responses to [plaintiff''s] timesheets, would be to relieve [plaintiff] of his responsibility to comply with his employer's policies regarding the reporting of overtime. The law is clear that this is not required." *Zhou*, 2017 U.S. Dist. LEXIS 48547, at *63.

Suson's overtime claims amount to vague allegations that she routinely worked from home beyond the 40-hour workweek.[3] She claims that that her supervisors had knowledge of her

---

[3] Additionally, in the five weeks cited in Suson's Complaint (the first three weeks of June 2013 and the second and third week of March 2014) in which she claims she worked 15 hours beyond the 40-hour workweek (Compl, ¶¶ 28-31), Suson reported on her time-cards that she took vacation or personal days during three of those weeks which, under PNC's overtime policies, do not count towards the 40-hour workweek for overtime purposes. SOF ¶¶ 59-60.

working from home beyond the 40-hour workweek, and did not compensate her, based on a limited number of emails that she initiated and sent to her supervisors from her home computer that included as attachments business plans and other regular work assignments. But Suson has no evidence that her supervisors were aware that she was working off the clock or that her time-cards did not accurately reflect the hours that she worked. *See Zhou*, 2017 U.S. Dist. LEXIS 48547. Further, PNC was unaware that she was studying for her licensing examination at home and Suson defied PNC's explicit instructions that required her to study at the branch location. SOF ¶¶ 66-67. Nor can Suson establish that drafting her lengthy complaints to human resources, purportedly completed at home beyond the 40-hour workweek, was a necessary part of her job, and constituted compensable work under the FLSA. *Jonites v. Exelon Corp.*, 522 F.3d 721, 726 (7th Cir. 2008) ("work" has been defined as "physical or mental exertion controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business").

Nor does Suson have any evidence that her supervisors discouraged her from reporting overtime hours, or instructed her to change their time-cards before they were submitted. To the contrary, Suson's supervisors encouraged her to accurately record the hours she worked from home as required by PNC's overtime policies, and paid her for the overtime hours accurately reported.

As a result, Suson's overtime claims under the FLSA and IMWL are subject to dismissal.

**B.    Suson's Overtime Claims Under the FLSA And IMLA Should Be Limited To The Five Weeks Specifically Alleged in Her Complaint.**

Suson's Complaint includes a detailed section titled, "Specific Week by Week Overtime Owed." (Compl. ¶¶ 27-37.) In introducing this section, Suson explicitly sets forth her intent to allege a "week by week declaration of overtime owed and amounts of overtime owed." (Compl., ¶ 27.) Accordingly, Suson identifies five specific weeks for which she claims to have worked approximately 15 hours of overtime from home: the first, second, and third weeks of June 2013,

and the second and third weeks of March 2014. (Compl., ¶¶ 28-32.) Suson refers to these weeks in her Complaint as "the relevant time period." (Compl., ¶ 35.) Nowhere in Suson's Complaint does she allege that she worked over 40 hours beyond those five weeks, and was not paid overtime wages.

Now, without amending her Complaint, Suson alleges through deposition testimony that she worked 15 hours of overtime at home *every week for her entire employment*, other than the dates that she was on medical leave. In *Lucero v. Leona's Pizzera, Inc.*, 2015 U.S. Dist. LEXIS 152309 (N.D. Ill. Nov. 3, 2016), this Court denied a 12(b)(6) motion to dismiss challenging an FLSA claim because the plaintiff sufficiently alleged in his complaint he *always* worked over 40 hours a week, and was misclassified as exempt. In contrast, Suson took it upon herself to voluntarily limit the scope of her Complaint by alleging she was denied overtime for five specific weeks, and she made no claims in her Complaint that she worked beyond those weeks and was denied overtime. While "there is no rule of law that requires [p]laintiffs to allege their hourly wage, the dates on which the alleged violations took place, or the specific tasks they performed off the clock," *Victoria v. Alex Car, Inc.*, 2012 U.S. Dist. LEXIS 43460, at *14 (N.D. Ill. Mar. 29, 2012), as a matter of justice and fairness, PNC should not be "left to guess when the plaintiff contends [s]he was underpaid." *Lucero*, 2015 U.S. Dist. LEXIS 152309 at *3.

This language from Suson's Complaint, limiting her overtime claims to five specific weeks, constitutes a judicial admission that she is not owed overtime for any other workweeks in the 2012-2014 time period. Suson and her counsel deliberately chose the words in the Complaint, the clear and unequivocal meaning of which is to convey that Suson has identified all "specific week[s]" for which she has any factual basis for claiming "overtime owed." "Judicial admissions are concessions in the pleadings that bind the party making them and that withdraw a fact from contention." *Guise v. BWM Mortg.*, LLC, 377 F.3d 795, 801 (7th Cir. 2004).

PNC relied on Suson's specific, clear, and unambiguous pleading, and it would be patently unjust and prejudicial to PNC to now permit her to add new claims other than the five weeks specifically alleged.

### C. Suson's Overtime Claims Are Barred, Or Limited, By The Statute Of Limitations Under The FLSA And The IMWL, And She Cannot Establish A Willful Violation To Support A Claim For Liquidated Damages Under The FLSA.

The FLSA provides a two-year statute of limitations for ordinary claims and a three-year statute of limitations for willful violations. 29 U.S.C. § 255(a). An employer willfully violates the FLSA if it either knew its actions were prohibited by the FLSA or showed reckless disregard for whether its conduct was prohibited by the FLSA. *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135 (1988). "Reckless disregard" means more than simply an error in judgment. *Id.* at 135 n.13. The Seventh Circuit described willfulness as "denoting a range of culpability from gross negligence to actual knowledge plus malice depending on the context." *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 308 (7th Cir. 1986). "Usually it denotes some highly culpable mental state either actual knowledge that one's acts violate the law or reckless indifference to the law." *Id.* at 308-09. Suson bears the burden of proof to show that PNC willfully violated the Act. *McLaughlin*, 486 U.S. at 133.

Here, although Suson seeks the application of a three-year statute of limitations under the FLSA, and seeks liquidated damages under the FLSA, she cannot meet her burden. PNC acted in good faith in its efforts to comply with the overtime requirements of the FLSA, and paid Suson for all overtime hours she reported on her time-cards. Most notably, PNC distributed its overtime policies to employees, which mandated that its employees obtain authorization from their supervisors before working overtime and that they truthfully and accurately report their time on their time-cards. Suson understood this policy; nevertheless, in violation of these policies, Suson claims that she consistently worked from home in excess of the forty-hour

workweek without seeking prior approval – or in defiance of her supervisor's explicit instructions – and then under-reported her hours on her time-cards in violation of PNC policy.

No one at PNC told Suson she should only record 40 hours for weeks she allegedly worked from home over 40 hours, or requested her to change her time-cards. To the contrary, Suson was told that she needed to report all her hours on her time-cards, including purported hours she worked at home, and she failed to do so. Suson claims that Acklam got angry when she inputted over 40 hours on her time-cards, and responded with a standard answer that she needed to come in late, or take a longer lunch to control the amount of overtime in the branch. An employer who discourages the use of overtime, or attempts to control overtime through scheduling, does not willfully violate the FLSA.

Suson did not file her Complaint until May 20, 2016. Accordingly, applying the two-year statute of limitations for non-willful violations, and based on the five specific weeks that Suson alleged in her Complaint, Suson's FLSA claims are time-barred and should be dismissed in their entirety on this basis.[4] Further, Suson's claims for liquidated damages under the FLSA should be dismissed. Liquidated damages may be awarded under the FLSA unless an employer demonstrates that "the act or omission giving rise to such action was in good faith and that [it] had reasonable grounds for believing that [the] act or omission was not a violation of the [FLSA]." 29 U.S.C. § 260. Suson's claim for liquidated damages is subject to dismissal because PNC acted in good faith, and in compliance with the FLSA, and paid Suson the overtime wages that she accurately recorded on her time-cards. 29 U.S.C. § 260; *see Bankston v. State of Ill.*, 60 F.3d 1249, 1254 (7th Cir. 1995).

---

[4]To the extent the Court entertains Suson's claim that she was denied overtime during her entire employment, beginning on July 30, 2012, PNC further maintains that any claim for overtime for the period July 30, 2012, to May 19, 2013 is time-barred under both the FLSA and the IMWL. *See* 29 U.S.C. § 255(a); 820 ILCS 105/12(a).

May 10, 2017

Respectfully submitted,

DEFENDANT PNC BANK, NATIONAL ASSOCIATION

PNC BANK, NATIONAL ASSOCIATION

By its attorneys,

/s/Gary J. Lieberman
Gary J. Lieberman
LITTLER MENDELSON, P.C.
One International Place, Suite 2700
Boston, MA 02100
(617) 378-6096
glieberman@littler.com

Catherine S. Lindemann
LITTLER MENDELSON, P.C.
321 North Clark Street, Suite 1000
Chicago, IL 60654
(312) 372-5520
clindemann@littler.com

## CERTIFICATE OF SERVICE

      I hereby certify that on the 10th day of May, 2107, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system to the following registered users:

John C. Ireland, Esq.
The Law Offices of John C. Ireland
636 Spruce Street
South Elgin, IL  60177


                                              /s/Gary J. Lieberman
                                              Gary J. Lieberman